All right, it looks like Council. We have one on video. I want to turn you on video and it sounds like you can see and hear us just fine. Is that right? Correct. Okay, great. And one Council in the courtroom, can you see opposing Council? Okay, so we can all everybody can see and hear everyone else so we're ready to hear your argument whenever you're ready to present it. All right, sounds like I'm coming through clear enough. Good morning, your honors. May it please the court Jennifer Schwartz on behalf of plaintiff appellants. I'd like to begin by addressing plaintiff's Wilderness Act arguments and then move on to our NEPA claims. I'll aim to reserve six minutes for rebuttal. The primary Wilderness Act question before this court is whether the legal framework from this circuits on bonk decision and Wilderness Society, the US Fish and Wildlife Service, which apply traditional tools of statutory construction compels a different outcome here. Then the agency deference approach taken by the panel in the Forest Guardians decisions. Well, Council, let me jump right in on that. So I'm looking at the in bank decision that Judge Gould wrote and he writes for the court with these principles in mind. We assess plaintiff's contention that the Enhancement Project offends the Wilderness Act most pertinent to our analysis is the Wilderness Acts prohibition of commercial enterprise within designated Wilderness Section 4C of the Wilderness Act states that subject to exceptions not relevant here. There shall be no commercial enterprise since Judge Gould wrote in that opinion subject to exceptions not relevant here and the per curiam panel opinion was discussing a particular exception that the panel cited. How could Wilderness Society have drawn into question the validity of Forest Guardians? Right, so this court again sitting on bonk and Miller v Gammy was very clear that the issues decided need not be identical. It's the reasoning and analysis that controls and it's the reasoning and analysis. The overall analytical framework from Wilderness Society that fatally undercut. Forest Guardians because Wilderness Society started by looking at the plain language of subsection 1130 and it's that broad commercial enterprise ban. They looked at that but counseled that broad commercial and Miller versus Gammy is a very high standard, right? They have to really be irreconcilable and to judge Bennett's point, right? The Alaska case what I'll call it. I'll call it the Alaska case for obvious reasons that had to do with a commercial fishery fishery operation. I mean to be sure the hatchery was hatching fish for commercial operation. Judge Gould recognized that very squarely. It's critical to the opinion, but there wasn't a specific statutory exception about fisheries and there is one pertaining in subsection D to grazing. So that's really the part of it. Correct, so just like the statute did not provide a specific exception for stocking the Wilderness Area Lake with native salmon that would eventually benefit commercial fishermen, nor does the statute provide an exception for predator control services on behalf of commercial livestock. Well, exactly. That's exactly right. So let's go to that if we could because I think that's probably where Judge Bennett was heading next. The exception is for grazing, right? Not for predator damage control, I'll say. I've just been wanting to call it that all week, although it's contrary to the acronym that you're using. Although, I mean, speaking of acronyms, I'm not sure I've ever had a case with four pages of acronyms. This might be a new record for me. Right, so predator management isn't specifically accepted, which is part of your argument, but why isn't it implied? Why isn't that reliably required? Because that ignores the fundamental canon of statutory construction that exceptions to a general prohibition must be narrowly construed. It gives those narrow exceptions improper breadth. But, but, but, but counsel, you, you may well be right, in theory, but that's not what the court enforced guardians held. The court enforced guardians said the subsection D exception allowed this specific thing that you are challenging here. And even if Judge Wallace, Judge Kaczynski, and Judge Paez got it wrong in their per curiam opinion, I do not see how the discussion in the in-bank case under the very high standard that Judge Christen mentioned makes that irreconcilable. That's because, Your Honor, they did not find that that exception provides for predator control services. They found that the statute was silent, and so they jumped right over the plain language of the commercial enterprise ban. They didn't even look at Section 1133C. But these are, these are reasons, if I can, I know I'm interrupting, but I think you're just glancing right past Judge Bennett's point. It may be that your argument is that the prior three-judge panel got it wrong, but we'd be bound by that prior three-judge panel unless this were to go en banc again. Absolutely. It is clearly irreconcilable. They are directly at odds. The reasoning and analysis of wilderness society fatally undercut that of forest guardians because forest guardians did not look at the plain language. It didn't even look at the overall purpose and structure of the Wilderness Act. It jumped right to the narrow exception and looked at it in isolation, failing to read the statute as a harmonious whole and ignoring the fundamental canon of statutory construction that a narrow, that an exception to a general prohibition must be narrowly construed. They ignore so many fundamental canons of statutory construction by just looking at the grazing exception in isolation. You only get to the second step of the Chevron doctrine if you can't ascertain congressional intent from the plain language. I'm just going to ask one more question on this subject. But all of those principles of statutory construction that you highlight all predated both the panel decision, predated some of them by a very long time, both the panel decision and the en banc court decision. The basic principles that you say the panel violated were all there well before the panel decided and well before the en banc court decided, right? Correct. And so that was their failure that they did not apply traditional tools of statutory construction. The most essential one is looking at the plain language of the commercial enterprise ban. They're reading the except as specifically provided for clause out of the statute. How do you square that with forest guardians? Council, I have a number of questions about NEPA. Can we turn to that? Or is there more that you wanted to say about the Wilderness Act? I will just close on one point with the problem here with the agency's interpretation is that they're conflating Congress's permission to allow domestic livestock to graze forage in wilderness with the killing of native wildlife on behalf of commercial grazing operations. Those activities are not one in the same. You cannot infer an exception that does not exist under the plain language of the statute because that would nullify that clause except as specifically provided for. And forest guardians recognize that the statute does not specifically provide for predator control services. They implicitly read it in, and that gives improper breadth to a narrow exception. We cite numerous cases, including this circuit's precedent, that the Wilderness Act commands strict judicial construction. Forest guardians took the opposite approach, again, and skipped right to the Chevron Doctrine's second step. And that's what makes it directly at odds with wilderness society and really irreconcilable. And with that, I'm happy to move on to your NEPA questions. Your Honor. Great. I appreciate that. I'm concerned, and this is going to be for both counsel. I'm concerned about the scope to begin with. The geographic scope in the EA at 3ER310 doesn't say anything about excluding ACECs. Right? And then I understand that Alternative 2 is the one that's been accepted. And Alternative 2, we know from 4ER440, I think this is undisputed, that the difference between what's going to happen going forward and what's been happening since the settlement is that wilderness areas and wilderness study areas are no longer going to be exempted. But we also know from that same page, 4ER440, that under Alternative 2, all work outside wilderness area or wilderness study areas will have to have the same processes, components, and geographic scope as Alternative 1. Alternative 1, of course, is the map. You know where I'm going with this, I think. The map, 4ER429, tells us that under Alternative 1, which has been the status quo, that areas of critical environmental concern are exempt. So I don't know how a member of a public could know whether they are or not. The district court certainly understood from the government that areas of critical concern, maybe I'll go back to the acronym, ACECs are exempt, that predator management wasn't going to be happening in those areas. What is your understanding? Are ACECs exempt or are they, under Alternative 2, are they going to be doing predator control there? I'm assuming you're- Yes, you're still figuratively at the podium, right? It's not clear. That was Plaintiff's point. In our comments, plaintiffs asked the government to clearly address all specially designated areas, including ACECs, and they did not. That's not clear from the EA. Is the answer that you don't know whether ACECs are included or excluded? We do not know. The government alleges that they do not allow lethal predator control in Nevada's many ACECs, and there are many ACECs, as we point out- I'm just going to try to get my questions in here as quickly as I can. I'm trying to get out of the way. My understanding is for this particular acronym, this particular type of federal land is within Nevada, there's 1.4 million acres of ACECs. Is that correct? Correct. Okay. So then if I could go to the regulation. The district court, it's on page 12, and it goes over to 13 of his opinion. He's talking about the application of 4 DCFR 1508.27B, and there's this difference of opinion. The government argued that under subpart three, that the unique characteristics of the geographic area, that the pertinent question, the relevant question, was whether these were going to be significantly impacted. I don't see that here in this regulation. It seems to be contrary to the plain language of the regulation. But the government cited a Tenth Circuit case. Have we ever adopted that standard? Not that I'm aware of, Your Honor. If you look at that 1508.27 regulation, you're right. The question is whether the activity impacts unique or ecologically critical areas. It does not impose the degree to which. And if you look at our case law, the case law that we've cited in our briefs, there's cases where there's pretty minimal operations in specially designated areas like wilderness, like a wildlife collaring project. That triggered that intensity factor. And here, in addition to the ACECs, well, the ACECs are an unknown question, but what we do know is that this decision authorizes lethal PDM to occur in 65 different congressionally designated wildernesses and 62 different wilderness study areas. And of that, Wildlife Services' own EA recognizes that that PDM will be performed on a year-round, so going to the degree of the activity, on a year-round or at least frequent basis within 1.7 million of those specially designated wildlands. So, for comparison, if you look at the Western Watersheds Project case that we cite from the District of Idaho, that court held that intensity factor required in EIS when Wildlife Services' PDM was proposed for just 1 wilderness study area and an ACEC. And here, the PDM operations approved for Nevada's specially designated lands are exponentially greater. So, we believe that factor alone triggers the need for an EIS. But then, of course, we also have the significant scientific controversy and uncertainty that requires an EIS here. Before you go to controversy, can I ask about a more specific question? Because I'm a bit distracted by it. There's quite a lot of data here about M44s. And I'm understanding that when it just says M44, I'll ask you both this question. I want the government to have a chance to respond to, that the M44 is the sodium cyanide ejector. Is that how you understand the record? That's one type, one mechanism that the government's been using or plans to use? Correct. Okay. And then there's a suggestion that the BLM has now banned those, that that's not going to happen going forward. There's nothing in the EA that sort of takes that back. I don't know that the briefing or the EA has caught up to this factual development that's suggested. But I just would like to give you both a chance to comment on that and ask us what we should make of that. Yeah, so that was post-decisional, that decision from the Bureau of Land Management. But that speaks to the significance and intensity of the use of those devices and their threat to public health and safety. That was the entire reason that the BLM made the policy decision to no longer use them, to no longer allow their use on federal public lands. So Council, if because of the post-decisional facts, we felt that that was no longer at this point a relevant consideration, that would not affect your argument as to lead, right? Correct. No, lead is a separate issue. It goes up the food chain. It also poses problems. They don't retrieve carcasses. And that's how it goes up the food chain. It's also somewhat concerning about the rigor here, because there was a concern expressed about this. There's been some human interaction, I think, injury, and also some pets that are killed. I don't know if any humans have been killed. You have, actually. I don't know that I have that in the record, but if you want to give me the citation, I'll certainly take it. But here's the comments. The government acknowledged the comments and responded by saying they were aware of them because a commenter had told them about it. We're aware of the incidents, but it says none of them occurred in Nevada, which strikes me as not terribly helpful. The final EA says that the use of sodium cyanide capsules poses negligible risk to the public who obey the law because the product label restricts the use only to certified applicators who are required to follow the label instructions. The products are not commonly available to the public. So I don't know whether these are going to be used going forward or not. It sounds like on BLM designated lands they won't be, but I don't know. Is that all the land we're talking about, first of all? There are Forest Service lands, and I don't know if they have adopted a similar policy. And then, of course, there's PDM on private lands where they will most likely continue using M44 devices. That could still pose threats to public health and safety if people are not clear where they are. But yes, I would agree with what you're saying, Judge Kristen, in terms of the rigor of their analysis is lacking, and we addressed that in our briefs. So let me ask you, following up on Judge Bennett's question about the lead shot, I think the cyanide ejectors, whether they're going to be used or not in these areas, and the lead shot, I think at this point the materials are talking about Ravens. Is that right? I'm sorry, for the lead? Well, for the cyanide ejectors. Is that primarily used for Ravens? No, no. For Ravens, they use poison-treated egg baits. For the cyanide ejectors, they're for canids, so coyotes and foxes. Okay, thank you for that clarification. So it's a different toxic material that's used for the birds? Yes, and that's why the M44s pose such a risk to people's companion animals because canids, dogs included, are attracted to them specifically. And people have been injured. One person died, and that's in the record in plaintiff's comments. I apologize, I don't have a precise record site, but the whole list of horrific incidents related to M44s are listed in plaintiff's public comments. Okay, I think you're just about out of time. Judge Bennett, do you have any other questions? No. I think we don't have any other questions. Counsel, you can plan that. We'll put two minutes on the clock when you come back. Okay, thank you. You're welcome. Let's hear from the government's counsel, please. We've been doing pretty well with the microphones today, but could you just state your appearance, and we'll make sure opposing counsel can hear you? Sure. Good morning, Your Honors, and may it please the Court. Caitlin Shugart-Schmidt here on behalf of the federal agencies. Counsel, can you hear the government's counsel? Hello? Counsel, I'm trying to make sure that you can hear the government's counsel. Oh, my apologies. Yes, I can. Okay, go right ahead. Thank you, Your Honor. For most of the last century, Wildlife Services has, upon request, helped to manage and resolve conflicts between people and wildlife, particularly in Nevada. That assistance can range from the removal of a mountain lion, posing a risk to hiker safety, to assisting grazing operators with predating wildlife. This Court, as we've discussed in Forest Guardians, has already held that assistance as permissible in wilderness areas, and that should conclude that issue for today. Could you turn to NEPA? Sure. Could you turn to NEPA? I'd be happy to, Your Honor. I think that there's clear evidence in the record here that Wildlife Services drew from its over 80 years of experience dealing with this specific issue. It drew from a very thorough review of modern literature on wildlife science and from a very robust public comment process to ultimately conclude that its actions in Nevada would have no significant impact. Like NEPA, of course, we're talking about how the public would know what's going to happen. My very first question has to do with this scope issue about ACECs that's not included in the initial scope. They're not exempted. So the agency's understanding is that PDM will not be conducted on ACECs under this EA. That is a statement that they are comfortable with making before you today and putting in the record or in any opinion, if necessary, to further reaffirm this point. Their understanding of the EA is that it does not allow work in these areas. Okay. So then could we go to, I think I have a couple other questions. That's helpful. And, of course, if work was ever going to be suggested to be done in one of those areas in the future, that would require additional NEPA analysis, which the agency acknowledges. Okay. So the geographic scope says that no, what I'm going to call predator management, if that's okay. Sure. What is going to be done in five categories, national recreation areas, national park service lands, U.S. fish and wildlife refuges, research natural areas, and the Inyo, is it pronounced Inyo? I'm not sure, Your Honor. I apologize. We're going to pronounce it Inyo National Forest for today. I hope my friends in Nevada will forgive me if that's wrong. Those five areas are exempted. But then, as we've just gone through, the alternative two also incorporates the map of alternative one, and that's how we get to the ACEC problem. But that map mentions national as exempt, national conservation areas, ACECs, and national scenic and historic trails. I mean, it really is a different list. Are all of those exempt, or how should we understand those to be treated? Yes, that's my understanding, Your Honor. Those are all exempt from the scope of coverage of this EA. So if we put that in an opinion, you'd be fine with that? Yes, Your Honor. Okay. I will note, if that's okay, Your Honor, that, of course, this ACEC issue was an issue that was not actually raised by plaintiffs in their comments on the EA itself. Thank you, and I probably have a different opinion about that. But since you're not contesting that all those areas are exempt, then the question is whether the public would have been aware of that. But I appreciate your candor very much. Could you go to the question I have about the standard, the regulatory standard, and whether or not it is correct to be relying on a Tenth Circuit case that reads the word significant into the subpart B? I'm sorry, could you go back to the beginning of that question, Your Honor? I just may have not collected at all from your comments to my opposing counsel. Oh, sure. Let me turn to the question. Let me find it. Here we go. The question goes to 40 CFR 1508.27. And I have to believe a person who does what you do for a living is pretty familiar with that regulation. And it's Part B, intensity, right? And then there's a drop-down list, what I'll call a drop-down list. Right. And Part 3 speaks to the unique characteristics of the geographic area, which is why I'm so concerned about how do we know which geographic areas are included or not. And you've, I think, conceded that point, or at least we've resolved that for today. A different problem, though, is that the government argued that the question was, that the relevant question was whether there would be significant impact to these unique characteristics. And the regulation does not say that. Part 2, 4, 5, many of them talk about the degree to which. But in these particularly unique areas, the regulation does not say that it has to hit a threshold of significant impact. Understood, Your Honor. I don't think this court, I don't have a case for you from this circuit asserting sort of that insertion of that language. What I can say is I don't think that this court needs to resolve it at all because here we're not talking about any impacts to these sort of unique areas. Well, how do we know that? The judge found otherwise. He said that the question was, and he's quoting the government's brief, that it didn't rise to this higher level. But how do we know this? Because when we're looking at the scope of a particular unique area, like, for example, here we're talking about wilderness areas or wilderness study areas, we're talking about 6.2 million acres, and wildlife services removed an average of 33 coyotes from the entirety of that 6.2 million acres. I just don't know how that answers my question. We know from this, if there's one thing this data tells us profoundly, is that this is not uniform throughout the state of Nevada, that this predator management is seriously concentrated. I would actually disagree and push back on that strongly, Your Honor. It's not at all concentrated. It's, in fact, very diffuse throughout the state. For example, 1,000 coyotes, which is the maximum amount removed from any county, are removed from Elko County, and Elko County itself is 10 million acres. So we know that the particular coyotes that are removed, when they're removed by wildlife services, they're done through methods that are extremely targeted and extremely specific, and the removal of those coyotes have no impact on the surrounding areas in terms of coyotes coming back in population. We can't just accept conclusory statements. I'm happy to provide citations, Your Honor. I'm looking for why, and it's not just the coyotes. Do you mean in terms of the state broadly, the state population broadly, or in terms of specific areas? What I'm trying to get at, first of all, is that it seems to me that the wrong standard is this is an error of law, and if it's what you advocated in your brief, it seems as if this is the standard your client advocated and perhaps used, that seems to me to be very problematic. It may be if they applied the right standard, they get to where you're getting today from the podium. I think that they did in their actual EA. I can try and look up that specific citation for you.  But I don't have it in hand right in front of me now. I don't have the table of contents showing where they looked to the uniqueness, but I am quite confident it's in there correctly, Your Honor. This is very thorough. So is the government's position that the standard that Judge Kristen has mentioned as not being in the plain text of B3, I understand you said you don't need to reach that, but if we decided we did need to reach that, is the government's position that we should import significantly into that section, or we should read the plain language, which doesn't have it? I think it is, you know, you could look to your sister courts in making that determination if you found that analysis persuasive, but if not, I don't think you need to reach that issue because it's just, there's virtually no impact here to anything, like a unique factor or a special area as the EA details. Well, again, I'm not saying that's not true. I'm trying to figure out how we would find support for that. Sure. Because these different areas are deemed special to use it on. Right, but no PDM is occurring in those special areas, correct? What I started to say is that there's, that's quite all right, but just for purposes of communication, clear communication, you know, they're designated for different reasons, right? So that's why it's very difficult doing what we do for a living because we're generalists and we're trying to follow the law to reach the conclusion that you're reaching. Without knowing why they're designated, it's tough to know how taking out X number of animals may or may not impact the ecosystem. So I'm at a loss. So if we're talking about areas like ACEC is the agency saying it's not doing any work in those areas whatsoever, right? And if we're talking about something like a wilderness area or a wilderness study area, we're talking about incredibly targeted limited removals as part of grazing operations, which are explicitly permitted by Congress, you know, in the context of extremely large areas, 6.2 million acres in the state of Nevada. Do you want to turn to cyanide and talk about cyanide? Sure, I would be happy to, Your Honor. I just want to make a couple of quick notes with regard to the sort of M44 devices. First of all, I just wanted to note that our footnote 27 on page 58 of our brief notes that these devices are actually not being used for wildlife services at all per the direction of Congress. And so they are not just being ---- It sounds like they were defunded. And it's always a little couched, and that's why I'm trying to figure this out. It indicates that BLM is not going to be using them or authorizing them. Does that speak to all of the lands we're concerned about here? No, Wildlife Services is no longer using them. The agency that actually conducts the PDM is no longer using M44s. We have that in our record somewhere. It is the citation to the Congressional Act directing Wildlife Services to do that is in that footnote 27 on page 58. You're talking about right at the end of the footnote? Yes, the second paragraph. All right. Thank you, Your Honor. Thank you. Of course, and I also just want to make sort of one specific note about M44s. Of course, they're not allowed even under the CA, even if they were allowed to be used in wilderness areas at all. And I understand that there are sort of safety concerns about any use of predator management, whether that's a trap, whether that's a gun, or whether that's a cyanide device like this. There are, you know, very specific safety regulations that are put into place, which is why it says consistent with the label that require signage and notification right around an M44 device. But it does not inspire confidence that the agency's response was to say those deaths or that those very concerning accidents didn't happen in Nevada. I understand that, Your Honor. But I'd ask you to look to the broader paragraph, the broader context of those statements. So run it by me one more time, and I'll pretend I didn't read that it said these didn't happen in Nevada. And what is the best take on it from your client's position? First of all, that they're not using them anymore. Second of all, that even when they were used in very limited circumstances, they're used consistent with the label, and that label requires safety precautions, just like any other type of predator management, whether that would be a gun or a trap or anything else, all of which include risk, but here that risk is very low because of the safety precautions that are put into pass. Obviously, we use, you know, other methods to remove predators, and those other methods can also have side effects or risk, so that's not. I mean, to state the obvious, it appears that the pets and the children who ran into these weren't reading the label. I understand that concern, Your Honor. Apparently weren't in Nevada, but that didn't alleviate my concerns. What about the lead shot? So there's just sort of two points that I'd make there, Your Honor, if I could. The first is that the safety of lead shot and the impacts to the environment are quite detailed in the EA itself. The second point that I would make sort of relates to this idea of, you know, relative impact on the environment, and here we're not talking about a world where when wildlife services doesn't engage in PDM, PDM doesn't happen, right? We're talking about a world where when wildlife services doesn't engage in predator damage management, other entities step and fill that void and conduct that same activity, but in a way that is less expert, less thoughtful, and less accountable. So here you can see from statements in the EA that wildlife services is both considering the impacts of the lead that it adds to the environment, but it's also— We're talking about 600 pounds of leaded ammunition per year here, right? I believe that's correct, Your Honor. I don't have the citation in front of me. But, of course, I want to note that that is in the context of all the lead that is, you know, put into the environment through hunting activities in Nevada, which is very significant. Nonlead ammunition is both hard to find—it's actually hard to acquire—and it is also very expensive. So while the agency is actively looking into ways to, you know, be able to use that or incorporate nonlead ammunition in its work, lead is the current standard. There's no evidence in the record, or maybe there is. You can tell me about how the lead, the 600 pounds or so of lead per year is spread throughout the state, whether it's concentrated in one area or not. Is there anything in the EA that discusses how much lead is in particular places or used in particular places as opposed to a gross number for the state? I think Your Honor could look to—so, for example, lead shot is used to shoot coyotes. We can look to where, say, aerial predation happens—sorry, aerial removal of predators happens in the state. That happens via gun. So, obviously, the areas where that type of PDM is being conducted when it's necessary is an area where lead is entering into the environment. Does the EA have any kind of quantitative analysis based on geographic areas? I don't believe so with respect to lead, but I could double-check, Your Honor. That's fine. If it's there, I didn't see it. But what I do want to make the point of, again, is the fact that if Wildlife Services wasn't conducting these removals, private parties or private commercial operators would be conducting the exact same removals, but they are less expert at doing it, which means likely a further introduction of negative impacts on the environment than when Wildlife Services is undertaking those activities. There are other EAs that have tackled this that have required nonlethal methods be used before lethal methods. So here, nonlethal methods are part of the professional decision-making model, and Wildlife Services employees are directed to consider nonlethal methods before lethal methods. The reality is— Wait, the last thing you said is different than the first thing you said. They're directed to consider them first? They're directed to consider whether nonlethal methods will be appropriate and then consider whether lethal methods will be appropriate. Okay, now you've said it three ways. My question is whether they're required to consider nonlethal methods first. My understanding is yes, under the professional decision-making model. Do you have a site for that? Yes, let me—  Yep, 3ER—sorry, I think it's 3ER309, but let me double-check here. 309, did you say? I think so, but let me just confirm I have two citations written down. Thank you. Nope, I want to look at— All right, let me double-check, Your Honor. It might be at 419, but if not, I will confirm. But there is a page in the EA that specifically lists the entire model that will be considered— decision-making model that will be considered by every employee when they are responding to a request for assistance. Yes, here we are. It is at 4ER419. Thank you. But I will also note, Your Honor, that the reality is that most of the time when somebody calls Wildlife Services for assistance, it's because they have already tried nonlethal methods of PDM and found them to be ineffective. In fact, the record notes that, on average, someone tries a nonlethal method or five nonlethal methods before they call Wildlife Services in the first place. So we're not dealing with a situation where Wildlife Service just shows up and says, you know, what's happening in this particular area? What could we do here to resolve this? They're being asked to respond to a specific problem, and sometimes the only response to that problem is the removal of the species that's predating. Plaintiffs note certain suggestions, like the use of range riders. Of course, those are already things that are incorporated in the nonlethal methods that Wildlife Services often recommends. And, of course, those come with tradeoffs. So, for example, you can further concentrate cattle in order to avoid coyote predation, but the more that you concentrate it, the more vulnerable those animals are when they're calving to predation by ravens, which can be particularly awful, or the more impact they're going to have on native landscapes because they're pushed into a particular group instead of being spread out, you know, to graze across a larger area. So that's why it's so important that we have professional decision makers coming in and assessing, you know, what is likely to have the least amount of impact but resolve this problem in these particular circumstances. Can we talk about the controversy about the efficacy? There's a lot of studies, and I think by my count there's a list of 33 of them. And there's a line in the EA that explains that they were set aside. And I think by my count there's nine of them I can set aside. I mean, the bulk of them are peer-reviewed. And the explanation is that they were either not peer-reviewed, and that's certainly not true, I think, of about 25 of them. Or they were opinion pieces. And there are a couple that are literally opinion pieces, so I don't have a problem setting those aside. But then it gets down to this other catch-all, which seemed to be that they didn't change the outcome, which sort of sounds to me like they didn't matter because they didn't matter, or they got set aside because they sounded entirely circular to me. What do we do about that? So I think the first thing that you do is you look at this through an arbitrary and capricious standard of review, and you say, has the agency here reached a reasonable conclusion? And if so, they're an expert agency. They're entitled to make their own decision. The second thing I would say is there is a lot of research here. So of course there's going to be some research that waves a little bit in one direction or maybe waves a little bit in a different direction. But the agency here clearly, thoroughly reviewed a huge amount of research. How do we know that? How do we know that? I mean, there's this 33 studies being set aside. And I said there's this catch-all category. First, if they weren't peer-reviewed, that would be one thing. But I think 25 of these were peer-reviewed, if I remember my count correctly. And I've tortured my locker. We've gone through each one of these. So what about that? Well, could I direct you to a particular study and talk about that as an example of why some of these don't reach the conclusion that plaintiffs assert? So, for example, the 2016 Travezz study, which you can read in the record, right, at 6ER1048, I think. A great deal of ink on this study, yes. Right. So, for example, if you look to that study specifically, it has sort of two aspects of conclusions in it, right? It actually looks to other studies that were done on predator control. For example, if you cull 25% of the wolves in Slovenia, what's the outcome, right? So it looks at this wide variety of studies. And what it actually concluded was that of the lethal studies, two said that they prevented more negative interactions, two say they increased it, and I think it was three said there was no effect. So that's the scientific, the research conclusion of the study. Travezz then has sort of, I would say, more political, more sort of philosophical thoughts on what the agency or anyone should do with the results of that study. And that's obviously not the type of expert conclusion or expert research that this agency needs to defer to. No, but there seems to be an evolution in more recent studies, the ones since the time of the settlement, that seem to suggest that it's not so clear that this is about the efficacy of this entire methodology. And I'm not sure, I'm trying to figure out, you're almost out of time, but I'll certainly let you answer this question. Where would you point to us in the record where you think your client really engaged in that controversy? So I think at my first site would be 4ER392, which is the discussion of Travezz. But if I could make one sort of larger, very quick comment on that point. I think that also shows the way that the plaintiffs are incorrectly framing what the goal of wildlife services here is. It's not to decrease future predation. It's not to resolve wildlife conflicts long-term.  It's just resolving those specific instances. Yeah, that's not my question. My question is I'm trying to make sure that you can point somewhere where the agency has engaged in these studies, in the science, not in the politics. Understood. And is your best shot the one that you just gave me? That one specifically deals with the Travezz study, but I think shows the depth to which the agency engages. There are other citations in my brief to the literature reviews contained in the EA, and I'd ask you to look there. Okay. Anything further? I would just like to reemphasize, if I could quickly, Your Honor, I would just like to reemphasize here that we're talking about 4,000 coyotes removed over the entirety of Nevada in a population that is incredibly able to, incredibly resilient, and there is sort of clearly from the evidence here, no effect from this.  There's mountain lions. I'm not sure why you're— Sorry, it's because plaintiffs have a particular focus on the coyotes, I would say, through their briefing. But if you look, for example, at, if I could just give you the quick citation, the definition of 4ER-598, they look at every single species that they impact and they look at what that impact is in relation to the overall species in the state. And I think that that's very valuable information. Thank you, Counsel. You have two minutes for rebuttal. Thank you, Your Honor. I'll quickly pick up on the scientific controversy and uncertainty factor that defendants try to portray as mere public opposition. But as you know, plaintiffs pointed to a robust body of current science on this topic, which include three comprehensive literature reviews, the Van Eden 2018 study, the 2017 Eklund study, and of course the 2016 Trevis study. Now, defendants acknowledge that they didn't even consider the Van Eden or Eklund study, and they only considered the Trevis study, basically to say that the type of unbiased studies with randomized design and multiple control sites that Trevis calls for would be too difficult for wildlife services to accomplish. What he otherwise refers to as the standard of scientific inference. Whether it would be challenging for wildlife services to accomplish such unbiased studies does not relieve the agency of its obligation to do so. And the wildlife services own cited studies in its own EA, such as the Mitchell 2004, Jaeger 2004, and Bradley 2015 studies, they all simply reiterate the point that the effectiveness of lethal controls is highly controversial. So they do not point to any countervailing evidence that resolves the scientific controversy here. And that's the standard for whether an EIS is required. It's not a matter of deferring to the agency's 80 years of expertise in killing wildlife. That doesn't show whether it's effective at achieving its primary purpose of reducing or preventing livestock losses. And that's what makes this case on point with the circuit's precedent in the BART case and the other wildlife services cases that we cite where this controversy factor indeed triggered the need for an EIS. Also going back to opposing council downplaying the impacts in specially designated areas. I don't know how you get to no impacts or even minimal impacts when you have the level of lethal PDM authorized in so many different, anywhere within 65 different congressionally designated wildernesses, 62 different wilderness study areas. And they're acknowledging that a decent percentage of that is going to be year round or a frequent basis. And back to your reading significance into that regulatory factor, I think you can look to this circuit's precedent to determine that it does not have a part in the regulation. We cite the environmental defense center, the bone case from the circuit in which that intensity factor was triggered just through actions that could impact important critical resources in one specially designated area. Council you're well over your save time. So I'm going to ask you to wrap up. Okay. And then finally we do know alternative grounds on the wilderness act issue that this court could hold in favor of plaintiffs and that's following the Sierra club, the link case, that if the agency is going to authorize an activity that clearly contravenes wilderness values, which lethal predator control certainly does, then it at least has to meet. It's an affirmative burden to show that that activity is truly necessary for its intended purpose. And the agency's failed to do that on the record here. Again, pointing to leave it at that because you're not two minutes over time. So that was for this rebuttal total. So forgive me, but we're going to cut off there. Thank you both for your advocacy. It's a very important case. We'll take it under advisement and get you a decision just as soon as we can. Thank you.  Thank you.
judges: BEA, CHRISTEN, BENNETT